### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**METAL PARTNERS, LLC,**

      **Plaintiff/Counter-Defendant,**

**v.**                                       **CASE NO. 06-14799**
                                                 **HONORABLE DENISE PAGE HOOD**

**L & W CORPORATION, and**
**SOUTHTEC LLC.,**

      **Defendant/Counter-Defendant/**
      **Third Party Plaintiffs,**

**v.**

**THYSSENKRUPP STEEL SERVICES,**

      **Third Party Defendant/Counter-Plaintiff,**

**and**

**JOHNSON CONTROLS, INC.,**

      **Third Party Defendant.**

_____/

### MEMORANDUM OPINION AND ORDER

**I.**      **INTRODUCTION**

Before the Court are the parties' Motions for Summary Judgment, both filed on October 17, 2008. Responses and Replies have been filed respectively. A hearing on these matters was held on March 4, 2009. For the reasons discussed below, the Court enters judgment in favor of Defendants

L&W Corporation, and Southtec, L.L.C. (respectively "L&W" and "Southtec") and Third-Party Defendant Johnson Controls, Inc. ("JCI") and dismisses Plaintiff Metal Partners, L.L.C.'s ("MP") Complaint and Counter-Plaintiff Thyssenkrupp Steel Services' ("TKSS") Counterclaim and enters judgment in favor of L&W and Southec and JCI on the issue of MP's and TKSS' liability for breach of its contract with JCI and L&W.  The issue of damages shall be submitted to the jury.

## II.    SUMMARY OF FACTS

In July 2005, MP and its partner TKSS began negotiations with JCI to provide steel to several of JCI's third-party stampers.[1] *See* Compl., ¶ 7.  MP is in the business of metal-supply chain management.  Compl., ¶ 2.  JCI is a fabricator of seats for the automotive industry.  *See* L&W and Southec's Counter Compl., ¶ 7.   L&W supplies steel seat components to JCI.  *Id.*, ¶ 8.[2]  On July 27, 2005, MP and TKSS entered into a Supply Agreement with JCI for Steel ("Supply Agreement"), which set forth the basic agreement between MP/TKSS and certain of JCI's third-party stampers.[3] Some of the terms of the Supply Agreement, such as the specific prices per unit were still be determined, and the Supply Agreement contemplated that these remaining terms would be hammered out and included in a Pricing Matrix, which ultimately occurred.  The Supply Agreement is a one-page agreement, which states:

1.    Supplier [MP] agrees that from September 1, 2005 through September 30, 2006

---

[1]  In February of 2005, MP entered into a trial supply period with a JCI stamper (Gill Manufacturing).  On May 3, 2005, Southtec issued Purchase Order S10095 to MP/TKSS ("Southtec Purchase Order"). The Southtec Purchase Order states that the effective date is October 1, 2005 and the expiration date is March 31, 2006.

[2]  L&W alleges that in order to be JCI's supplier, it is required to obtain raw steel from steel suppliers of JCI's choosing and at steel prices set by JCI.  *Id., ¶ 9.*

[3]  L&W is JCI's third-party stamper and deemed to be a "Buyer" as that term is used in the parties' agreement.

(tbd), it will sell and deliver to JCI and its designated third-party stampers (collectively "Buyers"), and Buyers agree to buy, steel meeting the specifications for the products as shown on the attached pricing matrix or as otherwise supplied to Buyers during September 2005 (collectively the "Steel"), to meet Buyers' requirements for the Steel in quantities as communicated from time to time by Buyers in purchase orders and/or material releases, at the prices stated below.

2.      Prices for the Steel delivered to Buyer during FY06 will be as stated in the attached pricing matrix. Buyers may purchase Steel for new or different part numbers at the same pricing as shown in the attached matrix for the same or equivalent Steel.  For any type of steel not shown, pricing will be consistent with and based on the base prices as shown in the attached matrix.  All volume data in the attached matrix and other projections are estimates only; actual quantities will be established in material releases issued by Buyers.

3.      After the initial purchases under this agreement, Buyers' ongoing obligation to purchase will be subject to their continuing reasonable satisfaction with Supplier quality, delivery, service and price-competitiveness.

4.      The Buyers will issue purchase orders pursuant to this agreement, provided that this letter agreement will govern any directly conflicting provision in any purchase order. All purchase orders will be governed exclusively by Johnson Controls standard Global Terms of Purchase (available at http://johnsoncontrols.com/asg/global-terms.htm) except as expressly provided in this letter, provided that any designated third-party stamper of Johnson Controls will be deemed to the be the "buyer" on any purchase order issued by the stamper under this agreement.

*See* L&W and JCI's Mot. for Summ. J., Ex. 1. The Supply Agreement references and incorporates

the Pricing Matrix, even though it was not complete by the date the Supply Agreement was signed

by the parties.  On August 15, 2005, JCI and MP agreed to the terms of the Pricing Matrix and MP

signed it on that date.  *Id.*, Ex. 2.  The Pricing Matrix indicates that the duration of the parties

agreement was from October 1, 2005 through March 31, 2006. *Id.*[4]

-----

[4]  The Pricing Matrix states the relevant dates are "Oct 1st 2006 through March 31, 06." The dates should have indicated that the start date was October 1, 2005.  This was a clerical error. Neither party disputes that the parties' agreement commenced on October 1, 2005. MP's October 24, 2006 Complaint indicates that "the parties agreed to terms of a Pricing Matrix for a term from October 1, 2005 through March 31, 2006."  Compl., ¶ 12.

The Supply Agreement also states that JCI's Global Terms and Conditions exclusively govern all purchase orders issued by JCI or its stampers. *Id.*, Ex. 1. JCI's Global Terms and Conditions state in relevant part that: "Time and quantities are of the essence under the Order. Seller agrees to 100% on-time delivery of the quantities and at the times specified by Buyer, as stated in the Order and related Material Releases." *Id.*, Ex. 5, ¶ 3.[5] The Terms and Conditions also gave JCI "the right to set off against or to recoup from any payment or other obligation owed to Seller, in whole or in part, any amounts due to Buyer or its affiliates or subsidiaries from Seller or its affiliates or subsidiaries." *Id.*, ¶ 27.

On September 15, 2005, L&W issued Purchase Order No. V103067 for L&W's Belleville Plant 1 and Purchase Order No. S102192 for L&W's Belleville Plant 2. *Id.*, Exs. 5 and 6. Both of the purchase orders listed the effective date as October 1, 2005 and the expiration date as December 31, 2005. *Id.* The purchase orders reference and state they are governed by JCI's standard Global Terms and Conditions. *Id.* L&W subsequently issued revised purchase orders, printed on October 6, 2005 and October 19, 2005, which listed the termination dates as March 31, 2006. *Id.*, Ex. 8. The purchase orders did not specify the amount of metal to be delivered to L&W and it was not until September 28, 2005 when MP received the first release specifying the amounts of metal L&W needed.[6] The release requested delivery of metal beginning the next day. *Id.* While MP claims that

---

[5] It is MP's contention that during the negotiations, MP informed JCI that it needed six to eight weeks notice, or "lead time" for an order for steel so that it could obtain steel from the mill. However, neither the Supply Agreement nor the Pricing Matrix indicate that six to eight weeks lead time was required.

[6] The Complaint states that the release arrived on September 28, 2006. This is a clerical error.

this request was in contravention of the parties' agreed to six to eight week notice or "lead time,",

MP began providing the steel that it could locate.  *Id.*; *see also*, Compl., ¶ 20.    MP claims that

because L&W gave insufficient notice, MP was forced to obtain metal on the open market at an

increased cost over its contract price, with costs exceeding $44,000.00  *Id.*, ¶ 21.  MP argues that

L&W's stringent and unreasonable requirements, coupled with the insufficient notice made it

difficult for MP to provide metal under the purchase orders.

On November 11, 2005, the local Michigan processor of steel for L&W Plants 1 and 2

informed MP that it would no longer do business with MP.  MP claims that it could no longer supply

steel to the L&W plants because of the quick turn around time JCI required.    On November 15,

2005, MP informed JCI that it would no longer be able to supply Plants 1 and 2 and requested that

JCI find another steel source and indicated that it would credit JCI for steel purchased for which MP

was obligated but unable to cover.  *See* JCI's Mot. for Summ. J., Ex. 11.  MP also indicated that "the

credit will be equal to the difference between the agreed upon price and the Detroit Metro area spot

price . . . .  *Id.*

L&W asserts that it spent $600,967.60 making "spot buys" of steel in order to fulfill its

contracts with JCI.  JCI kept MP informed of these steel prices and claims that MP never objected

to the prices until after L&W had already made its purchases.  On December 10, 2005, Debby

Rennels, Director of Purchasing for L&W, wrote to Jeff Clark of ThyssenKrupp:

> As you are aware L&W Engineering has been making spot buy purchases to cover
> shortages when Metal Partners has been unable to supply material that we have been
> directed to purchase from you as part of the JCI Resale program.  We have been
> directed by JCI to debit any premium costs associated with those shortages to Metal
> Partners.  In order to keep you apprised of what is happening I am writing to let you
> know the extent of those premiums []

*Id.*, Ex. 14.  Terrance Mulholland, Vice President of ThyssenKrupp, testified at his deposition that

JCI kept MP "abreast of the spot buys that they were making during the fall months of '05 and beginning of '06. *Id.*, Ex. 3, pgs. 154-55. Mr. Mulholland testified that the prices looked high to him, but he could not definitively answer whether JCI or L&W were contacted and questioned about these seemingly high prices for steel. *Id.* After all of the spot purchases had been made, on March 31, 2006, a new Controller for MP wrote to L&W about the spot buys:

> I have recently joined ThyssenKrupp Steel Services as the Controller of this division, which includes Metal Partners/TKSS. Your account with us has been brought to my attention and I was surprised by the dollar amounts involved and the events leading up to L&W's debits. After researching the situation, including the material that L&W submitted, I must deny the debits in the amounts requested at this time.

*Id.*, Ex. 15. L&W failed to pay MP for the steel it delivered to its plants, debiting the amount paid in set-offs from the total due to MP for the steel delivered in the Fall of 2005.

On October 24, 2006, MP filed the instant action against L&W and Southtec, alleging that both breached the Supply Agreement by failing to pay amounts due and owing for steel sold and delivered in the amount of $672,520.97. *See* Compl., ¶¶ 32-34; *see also*, MP and TKSS' Mot. for Summ. J., Ex. E.

On February 6, 2007, Defendant L&W and Southtec filed a Counter-Complaint against MP and a Third-Party Complaint against JCI raising the following claims:  breach of contract & indemnification against MP, Count I; breach of implied contract against MP, Count II; breach of contract and indemnification against JCI, Count III; breach of implied contract against JCI, Count IV; quantum meruit and unjust enrichment against both MP and JCI, Count V; promissory estoppel, Count VI. L&W and Southtec's alleged that it debited $768,037.82 from MP's account, which represents the excess price of the steel purchased on the "spot market." *See* L&W and Southec's Counter-Compl. and Third-Party Compl., ¶ 42. Further, L&W and Southtec assert that in addition

-6-

to the price increases debited to MP, additional costs were incurred due to MP's actions, as L&W had to locate steel on the "spot market," and run its operations overtime to fabricate steel components for timely delivery to JCI. *Id.*, ¶¶ 43-44. These additional costs total $243,504.25. *Id.*, ¶ 44.

On February 28, 2007, TKSS filed a Counterclaim against L&W and Southtec. In its Counterclaim, TKSS seeks damages in the amount of $369,418.93 for the metal L&W accepted but did not pay for and for $369,418.93 for the metal accepted by Southtec but not paid for. On April 11, 2008, this Court entered an Order Denying L&W and Southtec's Motion for Judgment on the Pleadings. *See* Doc. No. 41. On April 11, 2008, JCI filed a Cross Complaint against MP asserting a breach of contract claim for MP's failure to supply L&W's steel requirements.

## III.   APPLICABLE LAW & ANALYSIS

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry to summary judgment, after

-7-

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact. "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact." *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted).

### B.   The Parties' Motions for Summary Judgment

#### 1.   The Supply Agreement

A plaintiff must establish the following to state a breach of contract claim: 1) that the parties entered into a valid enforceable contract that included the terms and conditions claimed by plaintiff; 2) that the defendant breached the contract; and, 3) that the defendant's breach caused a loss to the plaintiff. *Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277 (W.D. Mich. 1986); *Pittsburgh Tube Co. v. Tri-Bend, Inc.*, 185 Mich. App. 581 (1990). In Michigan, the paramount goal when interpreting a contract is to give effect to the intent of the contracting parties. *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000). The court is to read the agreement as a whole and attempt to apply the plain language of the contract itself. *Id.* If the intent is clear from the language of the contract itself, there is no place for further consideration or interpretation of the agreement. *Farm Bureau*

-8-

*Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81 (1994). "When the written agreement refers to a separate document for additional contract terms, the court must read the writings together." *Wonderland Shopping Center v. CDC Mortgage Capital Inc.*, 274 F. 3d 1085, 1092 (6th Cir. 2001) (applying Michigan law) "[T]he court must strive to harmonize apparently conflicting terms or clauses," whether the terms are within the agreement or included in a separate, incorporated document. *Id.*

MP argues that L&W breached the parties' agreement by failing to pay for steel delivered and accepted by L&W. MP asserts that L&W improperly claims various amounts as set-offs. It is MP and TKSS' position that the Supply Agreement was merely "an agreement to agree–i.e., an agreement how TKSS would form contracts with JCI's suppliers." *See* MP and TKSS' Mot. for Summ. J., at 2. In support of this argument, MP and TKSS rely on the fact that the Supply Agreement states that "[a]ll purchase orders will be governed exclusively by Johnson Controls standard Global Terms of Purchase . . . ." *See* L&W and JCI's Mot. for Summ. J., Ex. 1. MP and TKSS argue that under the Terms and Conditions, purchase orders and their acceptance create the actual contract to buy and sell goods between TKSS and JCI's suppliers, not the Supply Agreement or corresponding Pricing Matrix. The standard Terms and Conditions state:

> 1. <u>Offer; Acceptance; Exclusive Terms; Identity of Buyer; Country Supplement.</u>
>    Each purchase order or purchase order revision issued by Buyer ("Order") is an offer to Seller for the purchase of goods and/or services ("Supplies") and includes and is governed by these Global Terms and Conditions . . . . When accepted, the Order supersedes all prior agreements, orders, quotations, proposals . . . . Seller accepts the Order, including these Terms, and forms a contract by doing any of the following: (a) commencing any work under the Order; (b) accepting the Order in writing; or (c) any other conduct that recognizes the existence of a contract with respect to the subject matter of the Order.

*See* L&W and JCI's Mot. for Summ. J., Ex. 6. Due to the express language of the Terms and

Conditions, MP argues that the parties' Supply Agreement is clear and unambiguous: a contract to buy and sell goods is formed only by an accepted purchase order. Further, the Terms and Conditions provide that the purchase order's duration control the length of the contract:

> [T]he agreement formed by the Order is binding on the parties for one year from the date the Order is transmitted to the Seller or, if an expiration date is stated in the Order or a signed agreement, until that date.

*Id.* Based on this language, MP and TKSS argue that the duration of the parties' agreement was governed by the purchase orders, or from October 1, 2005 through December 31, 2005, as stated on the initial, as opposed to the revised, purchase orders. Therefore, MP and TKSS' obligation to supply steel under the parties' agreement ceased on December 31, 2005. Further, because the Supply Agreement was merely an agreement to agree, it did not create an enforceable contract requiring TKSS to sell steel to JCI or its stampers.

The Court finds MP and TKSS' arguments to be without merit. MP agreed in the Supply Agreement that "it will sell and deliver" steel "to meet Buyer's requirements for the steel in quantities as communicated from time to time by buyers in purchase orders and/or material releases." *See* L&W and JCI's Mot. for Summ. J., Ex. 1. The Supply Agreement does not state that MP "may" or has the option to sell steel, it says it "will." The reference to the "purchase orders and/or material releases" is a vehicle for communicating what quantities would be needed and when. The Supply Agreement incorporates the Pricing Matrix, which states that the agreement was in effect from October 1, 2005 through March 31, 2006.[7] The fact that the two initial purchase orders

---

[7] The Supply Agreement actually set forth a lengthier period for the parties' agreement to be in effect, but the parties had not settled on this time frame: "[MP] agrees that from September 1, 2005 through September 30, 2006 (tbd), it will sell . . . ." *Id.* When the parties signed the Pricing Matrix on August 15, 2005, the duration of the agreement was agreed to be October 1, 2005 through March 31, 2006.

-10-

mistakenly listed December 31, 2005 as the expiration date does not mean that MP and TKSS'
obligations under the agreement ended on that date.  The December 31, 2005 expiration date
conflicts with the March 31, 2006 expiration date and the Supply Agreement states that "it will
govern any directly conflicting provision in any purchase order." *Id.*  Further, L&W later corrected
the purchase orders and MP accepted them and never objected to the March 31, 2006 date.  MP
repudiated the contract about a month after receipt of the revised purchase orders containing the
March 31, 2006 date. [8]

    The case cited by MP and TKSS is not persuasive.  *See Johnson Controls, Inc. v. TRW
Vehicle Safety Systems, Inc.*, 491 F. Supp. 2d 707 (E.D. Mich. 2007).  *TRW* also involved an
automotive supply contract by which over a period of years TRW would supply certain component
parts when JCI would issue purchase orders.  *Id.* at 709.  MP and TKSS cite *TRW* arguing that JCI
asserted the same position that MP and TKSS raise in this action: That the purchase orders constitute
the entire contract for the sale and purchase of goods.  However, *TRW* is distinguishable from the
instant matter because in *TRW*, the parties did not have a written supply agreement such as the
Supply Agreement in this case.  The parties agreement was governed solely by JCI's purchase orders
and the standard global terms and conditions referenced therein.  *Id*. at 709-10.  Therefore, JCI's

_____

    [8]  The Court notes that in its April 11, 2008 Order Denying L&W and Southtec's Motion
for Judgment on the Pleadings, the Court found that "a question of fact regarding" the revised
purchase orders "authenticity" prevented judgment on the pleadings under Rule 12(c). *See* Doc.
No. 41, p. 7. The Court noted that "discovery may lead to the resolution of this issue." *Id.* In
MP and TKSS' Response in Opposition to L&W and JCI's Motion for Summary Judgment, MP
and TKSS do not dispute the revised purchase orders authenticity.  Rather, MP and TKSS argue
that the date duration on the initial purchase orders was not a mistake.  Because the Court
concludes that the date duration of the Supply Agreement's incorporated Pricing Matrix controls
(October 1, 2005 through March 31, 2006) and the Supply Agreement "govern[s] any directly
conflicting provision in any purchase order[,]" the Court will not address the argument that there
was no mistake as it is irrelevant to resolution of this matter.

position in TRW is not inconsistent with its position in this matter and JCI is not estopped from arguing that the Supply Agreement terms govern where there is a direct conflict with terms in the purchase orders. The Court concludes that the Supply Agreement created an enforceable contract requiring MP to provide JCI's steel requirements and the Supply Agreement's incorporated Pricing Matrix controls the duration of the parties' agreement.

### 2. Breach of the Supply Agreement

The Court further concludes that MP breached the parties' Supply Agreement when on November 15, 2005, MP informed L&W that it would no longer supply steel and that L&W should look for another supplier. Even if the Court accepted MP and TKSS' argument that December 31, 2005 was the expiration date of the parties' agreement, MP would still be in breach for failing to supply steel under the Supply Agreement.

MP and TKSS argue that because L&W failed to provide adequate lead time, this relieved MP and TKSS of their obligations to provide steel under the Supply Agreement. MP and TKSS assert that L&W breached the agreement first, therefore MP and TKSS had no remaining obligation under the contract. It is MP and TKSS' position that during the parties' negotiations, TKSS informed JCI and L&W that it needed six to eight weeks notice, or "lead time," for an order of steel so that TKSS could obtain steel from the mill. *See* MP and TKSS' Mot. for Summ. J., at 3. MP and TKSS submit that L&W was aware of the necessity for sufficient lead time when supplying steel. *Id.* MP and TKSS assert that at the time of the parties' agreement, industry lead time was eight weeks. *Id.*

MP and TKSS have provided no documentation to establish that "lead time" was part of the parties' Supply Agreement. None of the documents (Supply Agreement, Pricing Matrix, Purchase

-12-

Orders with the standard Terms and Conditions) state that L&W was required to provide lead time when issuing purchase orders or releases. The language set forth in JCI's standard terms and conditions suggest otherwise, which state: "Time and quantities are of the essence under the Order, . . . Seller agrees to 100% on-time delivery of the quantities and at the times specified by Buyer . . . ." *See* L&W and JCI's Mot. for Summ. J., Ex. 5, ¶ 3. Additionally, JCI's standard Terms and Conditions contain an integration clause:

> Except as described in Section 1, the Order, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced therein, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in the Order. The Order may only be modified by a written amendment executed by authorized representatives of each party.[]

*Id.*, Ex. 5, ¶ 37. Under Michigan law, parol evidence of prior negotiations is inadmissable if the contract at issue is fully integrated. *See UAW-GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich. App. 486; 579 N.W.2d 411 (1998).

MP and TKSS also argue that "lead time" is a material term of the parties' Supply Agreement as it is a usage of trade. However, MP and TKSS have failed to establish that 'lead time' is a usage of trade in the steel industry. The Court notes at the outset that MP and TKSS have offered various 'lead times,'that were allegedly part of the parties' Supply Agreement. The lead time for steel has ranged anywhere from six to twelve weeks in various documents submitted by MP and TKSS. (*See* Compl., ¶ 14 (six to eight weeks lead time); *see also,* MP and TKSS' Mot. Summ. J., pg. 3 (eight week lead time); *see also*, L&W and JCI's Mot. for Summ. J., Ex. 1, Dep. Tr. of Terrence J. Mulholland, pgs. 84, 167 (six to eight, and later, ten to twelve week lead time). Michigan law defines a usage of trade as:

> Any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to

> the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

MICH. COMP. LAWS § 440.1205(2). The notes to this statute further provide that a usage of trade must have "the regularity of observance specified." *Id*., Comments, ¶ 5. Therefore, it is not required that usages be ancient or universal, full recognition is available for "new usages and for usages currently observed by the great majority of decent dealers" or for "usage agree upon merchants in trade codes." *Id*.

The parties' Supply Agreement expressly provides, in the incorporated standard Terms and Conditions, that time is of the essence and that MP agrees to 100% on-time delivery as requested by JCI. L&W and JCI's Mot. for Summ. J., Ex. 5, ¶ 3. Setting aside the issue of whether 'lead time' is a usage of trade in the steel industry, MP and TKSS' attempt to add terms that cannot be reconciled with the express terms of the parties' agreement is prohibited Michigan law. *See* MICH. COMP. LAWS § 440.1205(4). Michigan law provides that:

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

MICH. COMP. LAWS § 440.1205(4). The parties' agreement explicitly requires that MP and TKSS deliver L&W's steel requirements as set out in the purchase orders or material releases at the time L&W indicates. This express provision is inconsistent with a six to eight week "lead time," therefore the Supply Agreement controls. MP and TKSS cannot rely on usage of trade to make 'lead time' a material term of the parties' Supply Agreement. *See Bank v. Byrum*, No. 277581, 2008 Mich. App. LEXIS 1311, *7-8 (June 24, 2008) (Relying on MICH. COMP. LAWS § 440.1205(4) to

-14-

hold that the express provisions of the contract controlled despite evidence concerning their prior course of conduct).[9]

### 3.    Mitigation of Damages

MP and TKSS' last argument is that even if the parties' Supply Agreement obligated MP and TKSS to supply steel from October 1, 2005 through March 31, 2006, the prices L&W paid to cover the cost of steel were too high. MP and TKSS assert that L&W's set-offs were improper because L&W failed to mitigate its damages. MP and TKSS argue that L&W and JCI had supply agreements similar to the Supply Agreement at issue here. Specifically, MP and TKSS argue that L&W and JCI had an agreement with Orca Steel and that L&W could have issued a purchase order to Orca Steel for the contracted prices, but instead purchased the steel on the open market or made 'spot buys' from Orca Steel at prices significantly higher than the contracted prices.

MP and TKSS are correct that L&W and TKSS had an agreement with Orca Steel through March 31, 2006, however, in order to take advantage of the prices offered in the Orca Supply Agreement, L&W was required to submit purchase orders to Orca Steel no later than August 31, 2005. *See* L&W and JCI's Mot. for Summ. J., Ex. 2, § 2. By the time MP had repudiated the

---

[9]   The Court notes that even if 'lead time' did not contradict the express terms of the parties' Supply Agreement, the evidence submitted by MP and TKSS to establish 'lead time' as a usage of trade fails to meet the burden of "prov[ing] as facts" that 'lead time' is a practice in the steel trade "having such regularity of observance . . . to justify an expectation" that the practice was to be observed in the parties' Supply Agreement. *See* MICH. COMP. LAWS § 440.1205(2). Debbie Rennels, L&W's Director of Purchasing testified that she was familiar with lead time and in her experience, lead time varies in the steel market, anywhere from four to sixteen weeks. *See* MP and TKSS' Mot. for Summ. J., Ex. C, Dep. Tr. of Debbie Rennels, at 43-44. Without more, this is insufficient to establish that lead time is a usage of trade in the steel trade industry, especially in light of the fact that MP and TKSS have failed to establish the actual lead time in the steel market at the time of the Supply Agreement's execution.

parties' Supply Agreement, it was too late for L&W to obtain the prices set forth in the Orca Steel

Agreement.  The Court concludes that MP and TKSS have failed to demonstrate that a genuine issue

of fact is present as to L&W's alleged failure to mitigate its damages.

Based on the above, L&W was entitled to collect as "cover" the damages suffered as a result

of MP's repudiation of the parties' Supply Agreement.  MICH. COMP. LAWS § 440.2712 states:

> Sec. 2712.   (1) After a breach . . . the buyer may "cover" by making in good faith
> and without unreasonable delay any reasonable purchase of or
> contract to purchase goods in substitution for those due from the
> seller.
>
> (2) The buyer may recover from the seller as damages the difference
> between the cost of cover and the contract price together with any
> incidental or consequential damages . . . less expenses saved in
> consequence of the seller's breach.

MICH. COMP. LAWS § 440.2712.  Additionally, when MP repudiated the parties' Supply Agreement,

MP requested that L&W locate another supplier for steel and the "credit will be equal to the

difference between the agreed upon price and the Detroit Metro area spot price as shown below."

*See* L&W and JCI's Mot. for Summ. J., Ex. 11.  Therefore, the fact that MP and TKSS requested

that L&W 'cover' the damages for the breach, and indicated that it would allow set-offs for the

cover indicates that, at least, at one point in time, MP and TKSS agreed that L&W was entitled to

cover and to set-offs.  JCI's standard Terms and Conditions also provide that set-offs are available.

> Set-Off: Recoupment.   In addition to any right of setoff or recoupment
> provided by law, all amounts due to Seller will be
> considered net indebtedness of Seller and its affiliates
> or subsidiaries to Buyer and its affiliates or
> subsidiaries.  Buyer will have the right to set off
> against or recoup from any payment or obligation
> owed to Seller, in whole or in part, any amounts due
> to Buyer or its affiliates or subsidiaries from Seller

and its affiliates or subsidiaries. Buyer will provide
Seller with a statement describing any offset or
recoupment taken buy Buyer.

*See* L&W and JCI's Mot. for Summ. J., Ex. 5 § 27. L&W's set-offs were therefore an appropriate

remedy under Michigan law and the parties' Supply Agreement. The issue of damages will be

resolved at trial.

## IV.    CONCLUSION

Accordingly,

IT IS ORDERED that Metal Partners' and TKSS' Motion for Summary Judgment [**Docket

No. 61, filed on October 17, 2008**] is DENIED.

IT IS FURTHER ORDERED that L&W Corporation's and Southtec's and Johnson Controls,

Inc.'s Joint Motion for Summary Judgment [**Docket No. 62, filed on October 17, 2008**] is

GRANTED IN PART. L&W and Southtec's Counter-Complaint and Third-Party Complaint and

JCI's Cross-Complaint remain as to the amount of set-offs relative to the specifications issue.[10]

IT IS FURTHER ORDERED that Metal Partners' Complaint is dismissed.

IT IS FURTHER ORDERED that TKSS' Counterclaim is dismissed.

IT IS FURTHER ORDERED that a Final Pretrial Conference shall be held on December 2,

2009 at 2:00 p.m. The parties shall submit a proposed Joint Final Pretrial Order pursuant to L.R.

16.2 by November 30, 2009. All parties with settlement authority must appear at the conference.

---

[10] While the Court concludes that L&W was entitled to 'cover' and claim set-offs due to
MP's repudiation of the parties' agreement, whether L&W was entitled to set-offs for the scrap
metal and lack of steel resulting from L&W's alleged incorrect specifications remains a question
of fact for the trier of fact.

-17-

IT IS SO ORDERED.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  October 13, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 13, 2009, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager